James Clayton Culotta
Kenneth Joel Haber
Law Office of Kenneth Joel Haber, P.C.
15879 Crabbs Branch Way
Rockville, MD 20855
Telephone No.: (301) 670-0016
Facsimile No.: (301) 948-3091
Appearing *Pro Hac Vice*
as Counsel For Plaintiff: Nizar A. Yaqub

Eugene Epstein (State Bar No.031267)
144 West Gabilan St.
Salinas, California 93901
Telephone No.: (831) 754-4400
Facsimile No.: (831) 754-1201
Co-Counsel For Plaintiff: Nizar A. Yaqub

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| **NIZAR A. YAQUB, M.D.,** : | |
| : | |
| **Plaintiff** : | |
| : | **Civil Action** |
| **v.** : | **No:** |
| : | **Complaint And** |
| : | **Demand For Jury** |
| **SALINAS VALLEY MEMORIAL HEALTHCARE** : | **Trial** |
| **SYSTEM, INC., d/b/a SALINAS VALLEY** : | |
| **MEMORIAL HOSPITAL** : | |
| : | |
| **Defendant** : | |

### COMPLAINT FOR LEGAL, EQUITABLE, DECLARATORY AND INJUNCTIVE RELIEF, AND DEMAND FOR JURY TRIAL

Now comes Nizar Yaqub, M.D., Plaintiff herein, by and through his attorneys, Law Office of Kenneth Joel Haber, P.C., 15879 Crabbs Branch Way, Rockville, Maryland 20855, (301) 670-0016, and Eugene Epstein, 144 West Gabilan St., Salinas, California 93901, (831) 754-4400, and complains unto this Court for legal, equitable, declaratory and injunctive relief against the Salinas Valley Memorial Healthcare System, d/b/a Salinas Valley Memorial Hospital, Defendant herein, as follows:

COMPLAINT                                    1

1

**JURISDICTION AND PARTIES**

2   (1) This suit is brought and jurisdiction lies pursuant to 28

3       U.S.C. §§ 1331 and 1367.   This suit is in equity for

4       declaratory and injunctive relief, and damages authorized and

5       instituted pursuant to 42 U.S.C. § 1981 et seq., 42 U.S.C. §

6       1985, 42 U.S.C. § 1988, 42 U.S.C. § 2000d and 28 U.S.C. § 1367

7       and California Civil Code Sec. 50 *et seq.* and California

8       Business and Professions Code § 510.

9   (2) Plaintiff, Nizar A. Yaqub, who uses the name "Nick Yaqub" in

10      his personal and professional life,  is a citizen of the

11      United States and a resident of Monterrey County in the state

12      of California.

13  (3) Plaintiff was born in the country of Jordan, where he resided

14      until 1972.

15  (4) Plaintiff is a Muslim of Arab descent.

16  (5) Plaintiff is a Doctor of Medicine.

17  (6) Plaintiff is fully licensed to practice medicine by the State

18      of California.

19  (7) Plaintiff has been actively engaged is the practice of

20      medicine since 1972.

21  (8) Plaintiff has taught medicine as a member of the faculty of

22      Loyola University Medical Center at Chicago and as a member of

23      the faculty of the University of Illinois College of Medicine

24      at Chicago.

25  (9) Since 1979, Plaintiff has been board-certified in the

26      specialty of obstetrics and gynecology.

27  (10) Plaintiff is a fellow of the American College of Obstetricians

28      and Gynecologists (ACOG).

COMPLAINT                        2

1  (11) Plaintiff is a fellow of the American Association of
2       Gynecologic Laparoscopists.
3  (12) Defendant Salinas Valley Memorial Healthcare System, d/b/a/
4       Salinas Valley Memorial Hospital is a public, non-profit
5       corporation, organized under the laws of District Hospitals of
6       the State of California.
7  (13) Defendant is located in Salinas, California, in Monterrey
8       County.
9  (14) Plaintiff was a member of the medical staff of Defendant.
10 (15) Plaintiff has never been employed by Defendant.
11
12                          **STATEMENT OF FACTS**
13 (16) In 1991, Plaintiff purchased the obstetrics and gynecology
14      ("OB/GYN") practice of a retiring physician, Gordon Hershey,
15      M.D. and moved to Salinas, California to operate the
16      practice.
17 (17) Dr. Hershey's former practice was located in Salinas,
18      California and this practice has continued to be located at
19      the same site in Salinas, California since Plaintiff's
20      purchase.
21 (18) The practice is located one block from Defendant.
22 (19) In or about 1992, Plaintiff was granted provisional
23      privileges at Defendant for the practice of medicine.
24 (20) In or about 1993, at the conclusion of his provisional
25      period, Plaintiff was granted active status on the
26      Defendant's medical staff.
27 (21) Plaintiff was granted clinical privileges in OB/GYN at
28      Defendant.

COMPLAINT                              3

(22) In 1994, 1996, and 1998 Plaintiff was re-credentialed at
     Defendant in accordance with a standard biennial re-
     credentialing schedule without restriction or notation
     regarding clinical competence.

(23) Plaintiff made use of his previous academic experience and
     introduced progressive practices to Defendant's Department
     of OB/GYN.

(24) Plaintiff's Cesarean Section rate was half of his peers in
     Defendant's Department of OB/GYN

(25) Dr. Hershey's practice derived its revenues primarily from
     the treatment of Latinas who were also indigent patients
     whose care was paid for by the Medi-Cal program, a state
     program operating under the federal Medicaid program to
     provide medical care to indigent persons.

(26) Under Plaintiff, the practice he purchased from Dr. Hershey
     continued to derive the majority of its revenues from the
     provision of OB/GYN services to patients funded by Medi-Cal.

(27) Plaintiff's practice was recognized by a local Independent
     Practice Association (IPA) as one of the best of all of its
     memberships.

(28) Plaintiff had respect among the nursing staff, patients.

(29) Monterey County, where Defendant is located, is
     characterized by both high income, prestige communities such
     as Monterrey, California, and by low income communities
     populated largely by Latin American immigrants and/or
     persons of Latin American descent (collectively "latinas").

(30) There is a close association in Monterrey County between
     being a pregnant Latina and being a pregnant  Medi-Cal-

COMPLAINT                          4

1     funded female.  In 2001, 89% of latina obstetrical ("OB")

2     patients in Monterrey County were Medi-Cal funded.

3  (31) There are also two other hospitals in Monterrey County,

4     located distant from Plaintiff's practice.

5  (32) Due to a shortage of attending physicians Plaintiff was

6     invited in 1994 to join the staff at Natividad Medical

7     Center ("Natividad"), where he maintained privileges until

8     July 29, 2001.

9  (33) Plaintiff utilized Natividad for only a very small portion

10    of his cases requiring hospitalization.

11 (34) The facilities available at Natividad are perceived by the

12    great majority of Plaintiff's patients as not being as

13    comprehensive, well maintained, as up to date, and less

14    convenient as those of Defendant.

15         **A.  <u>Discrimination Against Latina Patients</u>**

16 (35) Only four out of eighteen of the physicians on Defendant's

17    medical staff accept Medi-Cal OB patients.

18 (36) None of the four physicians on staff at Defendant who accept

19    Medi-Cal OB patients accepts large or unrestricted numbers

20    of Medi-Cal OB patients.

21 (37) Medi-Cal OB patients make up less than fifty percent of the

22    four physicians practice, and less than thirty percent of

23    the total Medi-Cal OB admissions at Defendant.

24 (38) Plaintiff expanded his practice, increasing his number of

25    patients from 300 deliveries per  year in 1991 to 700 per

26    year in 1999.

27 (39) Plaintiff is, and has been, closely affiliated with latina

28    patients through his treatment of them as the vast majority

COMPLAINT                          5

1    of his patients.

2    (40) From 1992 through 2000 Plaintiff treated approximately

3    ninety-eight percent (98%) of his patients requiring

4    hospitalization or other hospital services/facilities at

5    Defendant.

6    (41) From 1997 through 2000, Plaintiff admitted roughly 2,000

7    latina Medi-Cal patients to Defendant for delivery of their

8    children.

9    (42) To the best of Plaintiff's information and belief, other

10   physicians in the OB/GYN Department at Defendant

11   individually have admitted significantly fewer latina Medi-

12   Cal patients per year  to Defendant for delivery than

13   Plaintiff has, and their admissions per year, consisting of

14   latina Medi-Cal patients, form a considerably smaller

15   percentage of each of those physicians' total annual

16   admissions to Defendant.

17   (43) The only other hospital within twenty miles of Plaintiff's

18   practice is a county hospital called Natividad Medical

19   Center ("Natividad").

20   (44) Defendant has and is harassing, coercing and discouraging

21   indigent latina patients from seeking treated at Defendant.

22   (45) In 1995, the Department of Pediatrics at Defendant proposed

23   procedures to require pregnant patients to select a

24   pediatrician, who would agree to the care of their infant

25   before delivery.

26   (46) It is Plaintiff's belief that the action taken by the

27   Department of Pediatrics was designed to limit access to

28   Defendant's services by Medi-Cal funded newborns, an action

1   which was condoned by the Department of OB/GYN and hospital
2   management.
3   (47) During 1996 and 1997, Plaintiff repeatedly asked Debra
4   Nelson, Chairperson of the Board, and the Board to
5   investigate discrimination toward his patients within the
6   Department of OB/GYN.
7   (48) The Board of Trustees of Defendant did not pursue his
8   requests to investigate and gave Plaintiff no reason for its
9   inaction.
10  (49) Despite Plaintiff's objections to Defendant concerning its
11  practices regarding latina Medi-Cal patients, Defendant
12  failed to act to prevent further harassment of latina
13  Medical patients, specifically, but not limited to the
14  Departments of Pediatrics and OB/GYN, of Defendant, making
15  it difficult for Medi-Cal patients to have newborn coverage,
16  such that in 1997.
17  (50) Plaintiff was forced to hire his own pediatrician to insure
18  care for patients' newborns.
19  (51) Each year since 1997, the number of Medi-Cal OB patients
20  (and by correlation latina OB patients) treated at Defendant
21  has significantly decreased each year, despite an increasing
22  number of Medi-Cal funded deliveries in Monterrey County
23  overall (3,363 such deliveries in the county in 1997 and
24  similar but slightly increased numbers in 1998, 1999, and
25  2000 rising to 3,840 such deliveries in 2001, a fourteen
26  percent increase).
27  (52) In 1997 Defendant had 1,226 Medi-Cal funded deliveries.
28  (53) In 2001, Defendant had only 661 Medi-Cal funded deliveries,

COMPLAINT                                  7

1     a reduction of 565 deliveries from its 1997 total, roughly a

2     46% reduction.

3 (54) These 661 included Plaintiff's 400 deliveries of his Medi-

4     Cal patients, the vast majority of whom were latinas,

5     leaving only 261 Medi-Cal funded deliveries attended by

6     other physicians on Defendant's staff during the year 2001.

7 (55) Other area hospitals have not experienced an overall decline

8     in the number of Medi-Cal funded deliveries over the 1997

9     through 2001 period.

10 (56) The two smaller Monterey County hospitals remained roughly

11     level in the number of deliveries over the 1997 - 2001

12     period.

13 (57) In 1997 Natividad had 1,214 Medi-Cal funded deliveries.

14 (58) In 2001 Natividad had 2,200 Medi-Cal deliveries.

15 (59) Medi-Cal deliveries at Natividad, comparing 1997 with 200,

16     rose by 986 patients, being roughly an 81% increase in 2001

17     over its 1997 figure.

18 (60) On numerous occasions Samuel Downing, CEO of Defendant, told

19     Plaintiff that he did not approve of Plaintiff expanding his

20     practice by increasingly sending indigent Latina patients to

21     Defendant.

22 (61) These encounters with CEO Downing occurred primarily during

23     discussions regarding Defendant's plans for the arrival of

24     managed care, or formulation of a hospital based medical

25     group.

26 (62) The discussions concerning managed care and the hospital

27     medical practice almost always included a discussion of the

28     large number of Plaintiff's patients who were Medi-Cal

COMPLAINT          8

1      funded, and how that fact was not well received by the

2      Defendant.

3 (63) In 1999, Medi-Cal in Monterey County became organized to

4      function as an HMO.

5 (64) Because of the large number of Medi-Cal patients Plaintiff

6      served, he sought to participate in coordinating Defendant's

7      Medi-Cal HMO program.

8 (65) Defendant refused Plaintiff's participation in coordinating

9      its program within the hospital.

10 (66) When questioned by Plaintiff as to the reasons for the

11      refusal, Sam Downing, Defendant's CEO, answered that

12      Plaintiff should take his patients to Natividad.

13 (67) Despite Defendant's harassment, Plaintiff's patients

14      expressed to him a strong preference, and indeed were

15      adamant that Plaintiff use Defendant for their hospital, as

16      opposed to Natividad.

17 (68) In 2002, Plaintiff  filed a formal complaint to the

18      California Department of Health Services ("DHS") concerning

19      improper care of, and discrimination against Medi-Cal

20      patients.

21 (69) To the best of Plaintiff's information and belief, the

22      attitude of Defendant's administration toward latina Medi-

23      Cal patients was widely known, and, depending upon the

24      physician, either actively supported, condoned or tolerated

25      by others within the OB/GYN department.

26 (70) Members of a group practice of physicians on staff at

27      Defendant - Healthcare for Women - have made it clear to

28      Plaintiff from the inception of his practice in the area

COMPLAINT           9

1   that they would not cross-cover him because he took large
2   numbers of Medi-Cal patients.
3   (71) Certain physicians on Defendant's staff, including *inter*
4   *alia*, Dr. Nelson, took action to interfere with physician
5   coverage agreed to by Dr. Norman Halfpenny, a physician on
6   Defendant' staff who had agreed to cover Plaintiff's
7   practice during periods of absence.
8   (72) In 1993, Dr. Nelson unsuccessfully attempted to restrict Dr.
9   Halfpenny from providing coverage for Plaintiff.
10  (73) In 2002, Dr. Halfpenny testified that he faced boycott by
11  other physicians because he was providing coverage for
12  Plaintiff.

13                  **B.   Discrimination Against Plaintiff**

14  (74) Beginning in 1991, when Plaintiff began his practice in
15  Salinas, California, and continuing to the present, to the
16  best of Plaintiff's information and belief, Defendant has
17  shown overt hostility to him by virtue of Plaintiff's own
18  race, ethnicity and/or national origin.
19  (75) Defendant's bylaws require each new staff member to be
20  proctored for the first two year period of their
21  appointment.
22  (76) In 1992, Dr. Norman D. Nelson was assigned to proctor
23  Plaintiff, and on February 15, 1994, just prior to the end
24  of the two-year period, Dr. Nelson resigned, without reason,
25  as Plaintiff's proctor, resulting in the delay of Plaintiff
26  obtaining full, unrestricted privileges at Defendant
27  Hospital.
28  (77) As Plaintiff achieved the required level of proficiency,

COMPLAINT                          10

Defendant continuously changed the criteria necessary to qualify to perform advanced laparoscopic procedures and conducted Plaintiff's review process in a manner differently than it treated other physicians.

(78) CEO Downing publically ridiculed Plaintiff by referring to a supposed ability of Plaintiff to buy the hospital, by referring to him as "the Bank of Salinas", and by attributing the expansion of Plaintiff's practice to "oil money," implying that access to "oil money" and other financial resources were consequences of Plaintiff's race and national origin.

(79) On at least one occasion, in or about March 1997, in front of Plaintiff and others, CEO Downing referred to Plaintiff as "Arafat," in a disparaging manner, clearly intending an association in the mind of the listeners, based upon ethnicity, between Plaintiff and a widely unpopular or feared person of similar ethnicity to Plaintiff.

(80) To the best of Plaintiff's information and belief, the attitude of the Defendant's CEO toward Plaintiff as a foreign born Arab was well known and, depending on the physician, either actively supported, condoned or tolerated by other physicians within the OB/GYN department at Defendant.

(81) Defendant conspired with certain physicians on its staff, including *inter alia*, Dr. Goodwein (currently Chairman of the Department), to eliminate Plaintiff as a staff member in consequence of his being an Arab foreign-born physician.

(82) Dr. Goodwein has specifically expressed a desire to get rid

COMPLAINT                              11

1   of foreign practitioners on the OB floor at the Defendant.

2   (83) A group of foreign-born nurses have filed formal complaints

3   against Dr. Goodwein because of his attitude toward

4   foreigners.

5   (84) Drs. Nelson and Gilbert have referred to Plaintiff as a

6   "third world country doctor."

7   (85) To the best of Plaintiff's information and belief, Drs.

8   Nelson and Gilbert have made disparaging remarks about the

9   "third world" origin of another Asian-born physician, Dr.

10  Chang, who is no longer practicing in the area.

11  (86) In 1995, Plaintiff was elected as chairman-elect of the

12  department and the chairman of the Quality Assurance

13  Committee within the Department of OB/GYN at Defendant by

14  vote of those in attendance at the meeting, who constituted

15  less than a majority of the Department but who were,

16  nonetheless, permitted under the rules in effect to select a

17  chairman-elect in the absence of a majority of the

18  Department.

19  (87) As chairman of the Quality Assurance Committee, Plaintiff

20  started to introduce newer and more efficacious methods of

21  peer review as recommended by The American College of

22  Obstetricians and Gynecologists (ACOG) and the Joint

23  Commission on Accreditation of Healthcare Organizations

24  (JCAHO).

25  (88) Other physicians in the department resisted these changes.

26  (89) In July 1995, a majority of the department members voted to

27  disband the Quality Assurance Committee and transfer the

28  quality assurance functions to the whole Department where

COMPLAINT                          12

1       one particular group medical practice, of which Drs. Nelson

2       and Gilbert were members, held a super-majority.

3   (90) One of the stated reasons for this action was to remove

4       Plaintiff from any leadership position in the Department.

5   (91) To the best of Plaintiff's information and belief, such

6       action was taken based upon antipathy within the Department

7       toward Plaintiff's race and national origin and upon

8       antipathy toward the race and national origin of his

9       patients.

10  (92) On August 26, 1996, while Plaintiff was chairman-elect of

11      the department, certain members of the OB/GYN department,

12      including Drs. Nelson, Ramirez, Rodriguez, Watkins, and

13      Gilbert petitioned the assistant administrator/medical

14      director of Defendant, Dr. Ralph Keill, to have Plaintiff

15      step down as chairman-elect of the department or face being

16      referred by those doctors to the Medical Executive Committee

17      (herein the "MEC") upon allegations they would make relating

18      to medical competence.

19  (93) Plaintiff did not voluntarily step down, but rather was

20      voted out as chairman-elect, and chose not to appeal this

21      action, in order to avoid taking on a time consuming

22      internal political battle.

23  (94) The events concerning the Quality Assurance Committee and

24      the Department Chairmanship commenced a period of active

25      discrimination, harassment and overt actions against

26      Plaintiff via abuse of Defendant's medical peer review

27      process.

28  (95) Defendant has raised the standards for obtaining specific

COMPLAINT                    13

clinical privileges in order to exclude Plaintiff as he gained sufficient proficiency to qualify under existing standards for privileging, particularly in the area of laproscopic assisted surgery.

(96) On or about June 25, 1997, the Medical Executive Committee ("MEC"), an internal review body charged under the Bylaws with making recommendations on physician discipline, refused, in response to Plaintiff's requests, to alter a high severity rating it had adopted relating to Plaintiff's treatment of a patient in 1994, despite uncontradicted expert reports stating that the degree of severity with which Plaintiff's conduct was rated was not appropriate.

(97) Defendant had itself procured the opinion of the external reviewer that found that Plaintiff had only slightly deviated from the standard of care, and then refused to change the code despite the reviewer's finding.

(98) Contrary to its refusal to reopen a matter to consider action which could have benefitted Plaintiff, Defendant's MEC did reopen and reverse findings in earlier cases of Plaintiff in which Plaintiff had been found to have met the standard of care, without any determination that the earlier reviews had been inadequate in any respect.

(99) Sometime in 1997 or 1998, Dr. Nelson, initiated, without authority and with not one single patient complaint to Defendant or any other entity or pending or settled lawsuit, an intense personal scrutiny of Plaintiff's medical practice, specifically the manner in which Plaintiff managed and provided medical care to his patients at Defendant.

COMPLAINT                                    14

(100)   On or about July 24, 1998, Plaintiff became aware that Dr. Nelson, had personally reviewed some of Plaintiff's patient charts while the patients were still receiving treatment at Defendant.

(101)   To the best of Plaintiff's information and belief, no other physician in the OB/GYN Department has been subjected to this degree of scrutiny by Defendant.

(102)   To the best of Plaintiff's information and belief, this review was not done at the direction of a peer review committee or the MEC, but was rather undertaken by Dr. Nelson on his own volition.

(103)   There is no authority for an individual physician, who at the time held no office in the Department of OB/GYN or on the medical staff, to review individual patient charts of another physician absent adherence to the procedures outlined in the Medical Staff Bylaws.

(104)   Plaintiff, via correspondence dated July 24, 1998, stated to Dr. Nelson that he considered the review of these active patient charts to be improper because Dr. Nelson was not a treating physician and his review of the charts was an invasion of the patients' privacy.

(105)   Via correspondence dated July 22, 1998, Dr. Nelson, informed Plaintiff that a special Department meeting, was scheduled on August 5, 1998 for the express purpose of discussing Plaintiff's treatment and management of a patient, herein referred to as "P.M." for purposes of preservation of the patient's confidentiality, and to review the need for three in-office procedures

COMPLAINT                          15

1           referenced only by file number.

2   (106)   Although being informed that this date would cause

3           Plaintiff considerable difficulty because of the need

4           to have other physicians, as appropriate, attend the

5           meeting to address the treatment of P.M., and because

6           Plaintiff was exceptionally busy with work at the time,

7           Dr. Nelson refused, without explanation, to reschedule

8           the August 5, 1998 meeting.

9   (107)   Despite a written request by Plaintiff for the

10          "specific items" he would need to address and for the

11          identification of "exactly what the issues are," Dr.

12          Nelson  refused to provide any specific information on

13          the patient "management" issues or the "privileging"

14          issues to be discussed at the meeting other than the

15          vague notice letter.

16  (108)   Despite notice that Plaintiff did not keep his patient

17          records filed by file number and that he would need the

18          names of the patients in order to provide information,

19          Dr. Nelson did not provide the names until a letter

20          dated July 28, 1998 informed Plaintiff that the Health

21          Information Management Department would give him the

22          names.

23  (109)   By letter dated July 29, 1998, Dr. Nelson, without

24          reference to his previous letter, changed the source

25          from which the names could be learned to the "Quality

26          Management Department or Medical Records Department."

27  (110)   The refusal to reschedule and refusal to inform

28          Plaintiff of the specific matters to be discussed

COMPLAINT                          16

effectively deprived Plaintiff of the opportunity to
attend or even prepare to present his position and
defend his interests in writing.

(111)   The minutes of a Department of OB/GYN Special Quality
Improvement Committee dated August 4, 1998 - the day
before the scheduled August 5th meeting of which
Plaintiff had notice,  indicate that those members in
attendance (Drs. Nelson, Rodriguez, Ramirez, Goodwein
and Gilbert) reached conclusions as to the treatment
provided Maria Doe on specific treatment and
privileging issues and recommended referral to the MEC
and credentials committee.

(112)   Further, the committee had concluded on August 4th that
based upon the lack of records which neither Plaintiff
nor any other staff physicians were required to keep on
in-office procedures, the need for the three numbered
patients' procedures was not demonstrated.

(113)   On August 31, 1998, Plaintiff notified the Defendant's
Board in writing that he was being discriminated
against.

(114)   Upon referral of the matters taken up at the August 4,
1998 meeting to the MEC from the Department, Plaintiff
requested that the MEC order an outside review of all
department members.  This was not done.

(115)   Plaintiff also requested that the MEC arrange for an
outside review of his cases because he believed that he
could not receive an unbiased review within the
Department.

COMPLAINT                        17

(116)     The MEC agreed to bring on site a neutral reviewer from
          the University of California, San Francisco, to
          investigate the allegations against Plaintiff, with an
          opportunity for Plaintiff's input, a consideration
          which had been offered on other occasions to other
          members of the medical staff.

(117)     Despite the MEC agreement to an on site review, and its
          agreement for Plaintiff's input, it instead sent
          Plaintiff's patient charts for an off-site review paid
          for by the Defendant.

(118)     Plaintiff attempted to provide additional information
          to the reviewers, but the university liaison for the
          review did not send the reviewers the information which
          Plaintiff provided, apparently because Defendant had
          not agreed to authorize the review of this information.

(119)     Despite a specific inquiry from the liaison about
          whether or not to send Plaintiff's information to the
          reviewers, the Defendant did not request that the
          information be sent.

(120)     One of the cases reviewed, and alleged to be
          substandard, was actually performed by another
          physician, Dr. Neil Rudo, and Plaintiff's involvement
          was only collateral.  Dr. Rudo is a native born white
          physician, and was never scrutinized regarding his
          involvement in the case.

(121)     Another case Defendant's expert was critical of was an
          abdominal x-ray, and again, while Plaintiff's
          responsibility and expertise were not in the reading of

COMPLAINT                          18

1    x-rays the by native born white radiologist was never

2    questioned by Defendant.

3  (122)  Defendant took action against Plaintiff on other cases,

4    (charges 1,7, and 14), in which he had not been the

5    primary or treating physician but did not question or

6    take any action against the white physicians.

7  (123)  With limited access to records of Defendant's Quality

8    of Care Department, Plaintiff discovered that many

9    cases performed by white physicians, particularly Drs.

10    Nelson, Goodwein, Watkins, and Ross, have the same

11    alleged deficiencies, which formed the basis of

12    Defendant's action against Plaintiff.

13  (124)  On July 15, 1999, without any discussion or further

14    examination of the outside reviewers, the MEC convened

15    a special Closed Session Meeting, and, without any

16    input from Plaintiff to the review process or to the

17    committee whatsoever, voted to revoke Plaintiff's staff

18    membership and privileges at Defendant.

19  (125)  Defendant has suspended Plaintiff's privileges and is

20    proceeding to finalize its termination of his staff

21    membership for reasons other than quality of patient

22    care.

23  (126)  During the August 15, 1999 MEC meeting, despite having

24    already determined to take action against Plaintiff,

25    the MEC authorized Dr. Nelson to review all of

26    Plaintiff's cases for the previous six years to develop

27    "a more definitive list," without specifying any

28    standards by which to conduct his review.

COMPLAINT                              19

(127)  The standards of review require that a physician is
       entitled to a neutral review.

(128)  Plaintiff was never provided a neutral review.

(129)  The charts identified as actionable by Dr. Nelson were
       directly subjected to adversarial proceedings conducted
       by other white physicians.

(130)  Plaintiff's expert on peer review opined that
       Defendant's actions were neither proper nor reliable.

(131)  None of the charges, which formed the basis of the
       action against Plaintiff, were the result of patients'
       complaints, nurses' complaints, or other third party,
       except Dr. Nelson.

(132)  Despite the breadth of the review and despite his
       status as a competitor of Plaintiff and the concurrent
       incentive to highlight any real instances of
       professional misconduct by Plaintiff, Dr. Nelson only
       identified  sixteen (16) medical records from a total
       of over 13,000 admissions from 1993 to 1999 (about one
       tenth of one percent  of Plaintiff's admissions) in
       which he personally had questions about Plaintiff's
       meeting a standard of care.

(133)  Dr. Nelson produced these charts to create salacious
       and inflammatory charges against Plaintiff to
       capitalize on incidents which occurred; despite the
       fact that the incidents were known complications of the
       procedure being preformed.

(134)  Dr. Nelson's charges included charts that had not been
       reviewed by Quality Assurance because they did not

COMPLAINT                          20

contain clinical indicators which would warrant review.

(135)   Dr. Ross testified that charges similar to those brought against Plaintiff had been dropped as to him.

(136)   Four cases identified by Dr. Nelson arose from the (then) newly introduced laparoscopy assisted vaginal hysterectomies, a procedure Plaintiff began doing in January 1996 and then, on his own initiative, abandoned in August of the same year, due to lack of efficacy and higher complications, a procedure which was only later abandoned by many members of the department after a six month review sustained Plaintiff's view of the procedure.

(137)   The Department of Surgery had insisted upon an audit of laparoscopy assisted vaginal hysterectomies because of a high rate of complications.  This audit was performed by the Department of OB/GYN and showed that Plaintiff's complication rate was third among the whole department.

(138)   Plaintiff is not aware of any action that was taken against the other two physicians showing a higher rate of complications from these procedures.

(139)   Four cases identified by Dr. Nelson had been previously reviewed by the Department of Quality Improvement, by whom Plaintiff had already been found to have met the appropriate standard of care in those cases.

(140)   One case identified by Dr. Nelson  had been investigated by the Medical Board of California, which found that the care Plaintiff provided met the standard of care.

COMPLAINT                    21

(141)    Only one case out of approximately13,000 cases of
         Plaintiff resulted in any significant payment
         (approximately $75,000) to a patient for medical
         malpractice.  The action was lodged in 1999, after the
         date of Dr Nelson's review, and settled in 2000.

(142)    Plaintiff settled this malpractice case because of
         pressure brought to bear upon him by the Defendant
         herein, which was also a defendant in the malpractice
         case.

(143)    Neither Plaintiff nor the Defendant herein has admitted
         any wrongdoing in connection with this case and
         Plaintiff has denied any professional misconduct in
         connection with this case.

(144)    The case was reported to the Medical Board of
         California and the National Practitioner Data Bank
         under provisions of state and federal law relating to
         malpractice actions.

(145)    Fourteen of the identified cases involved had no
         residual injury or long term complications.

(146)    Six of the identified cases did involve complications;
         however these were complications which could be
         expected in a certain number of these kinds of cases,
         and they were immediately recognized, and the treatment
         provided by Plaintiff was determined by experts to be
         have met the standard of care.

(147)    All of the medical records identified by Dr. Nelson as
         problematic were subsequently reviewed by  expert
         reviewers who found that Plaintiff acted within the

COMPLAINT                              22

1          appropriate standard of care.

2  (148)   The Department of OB/GYN had already reviewed four of
3          these cases (7,9,10, 16) prior to Dr. Nelson's review
4          and found the care to have been appropriate.

5  (149)   Nevertheless, on August 23, 1999, the Defendant through
6          the MEC initiated formal proceedings to terminate
7          Plaintiff's privileges, and included these four cases
8          in its review, along with the 16 identified by Dr.
9          Nelson.

10 (150)   Plaintiff requested a hearing under the medical staff
11         bylaws.

12 (151)   At the request of Plaintiff, in anticipation of further
13         action by Defendant, the charts identified by Dr.
14         Nelson were reviewed by Dr. Roger Spencer,
15         Perinatologist from Stanford, (1a,1b, and 2), by Dr
16         James Ross MD, PhD, Gynecologic Laparoscopist,
17         (3,4,5,6), by Dr. Davis Baldwin, Gynecologist from
18         Stanford (7 and 8), by Dr. Juan Felix a GYN Pathologist
19         from USC, (11,12,13), by Dr. Neil Rudo, Vascular
20         Surgeon, (14), and by Dr. Anthony Smith, Gastro-
21         enterologist (15). Treatment in all cases was found to
22         be "appropriate" or to have met the standard of care.

23 (152)   On October 15, 1999, Plaintiff received notice of a
24         hearing before a "fair hearing panel."

25 (153)   On a date to be determined, sometime in or about
26         October 1999, and prior to the start of Defendant's
27         hearing, Plaintiff was notified by the Medical Board of
28         California that it had received a complaint bearing the

COMPLAINT                      23

same charges as those raised by Defendant.

(154)   On February 8, 2000, two additional charges were added based upon referrals from Drs. Nelson and Goodwein.

(155)   During the pendency of these proceedings, Plaintiff retained full and unrestricted privileges, since no summary suspension was imposed.

(156)   The proceedings before the hearing panel commenced August 30, 2000.

(157)   The proceedings before the hearing panel were not unbiased and the decision of the panel was not "fair" as the term is generally understood.

(158)   Plaintiff was denied the opportunity before the hearing panel, the MEC or before any other peer review committee to compare his records with the record of other physicians in the Department, despite the fact that precautions could have been readily taken to preserve in confidence the identities of the other physicians.

(159)   Plaintiff was denied the opportunity to present statistical evidence showing his rate of complications from vaginal deliveries of breech babies was better than the complications from Caesarean delivery of breech babies.

(160)   Plaintiff was denied the opportunity to fully present his technical case.

(161)   Plaintiff was denied the opportunity to cross examine his accusers on issues that had previously been brought out on direct examination.

COMPLAINT                                    24

(162)   Plaintiff was denied the opportunity to question the fairness and efficacy of the peer review process of defendant.

(163)   The hearing officer was accepted during the first hearing without the knowledge that he had a longstanding relationship with the hospital as a former member of the Board of Governors of the Hospital Foundation.

(164)   One of the Hearing Panel members has had business transactions with Defendant that were never disclosed.

(165)   The actions by the MEC and the hearing panel, were subjective and biased, and thus not in compliance with JCHACO and ACOG standards of peer reveiw.

(166)   On April 20, 2001, the hearing panel recommended suspending Plaintiff for 90 days, but did not recommend permanently restricting the majority of his privileges as had been requested by the MEC.

(167)   Defendant requested internal appellate review of the hearing panel's recommendation.

(168)   On June 20, 2001 Plaintiff's appeal was heard by the Board of Directors, ("Board").

(169)   The hearing by the Board of Directors bypassed the Appeal Review Panel as required by Defendant's Medical Staff Bylaws.

(170)   On July 13, 2001, without having accorded Plaintiff the access to information concerning the performance of other physicians and without permitting him a full opportunity to present his technical case, the Board of

1    Directors recommended termination of Plaintiff's OB/GYN
2    privileges with the exception of vaginal and Caesarean-
3    section delivery of infants, privileges he retained,
4    but from which he was suspended for 90 days subject to
5    various requirements, effective July 19, 2001 (later
6    changed to commence on July 25, 2001).

7    (171)   On or about July 18, 2001, Plaintiff received a letter
8    from Defendant's legal counsel, that he should transfer
9    his patients to another facility such as Natividad
10   Medical Center.

11   (172)   Plaintiff challenged the fairness of the hearings and
12   the Board decision in Superior Court.

13   (173)   The Superior Court upheld the Board's decision;
14   however, the decision of that court only related to the
15   fairness of the hearings in a narrow technical sense as
16   to whether or not a peer review proceeding afforded the
17   physician minimal protections.

18   (174)   The court did not review the substance of the
19   Defendant's decision for fairness.

20   (175)   Given the restrictions on Plaintiff's presentations to
21   the hearing panel and the Board, and the disparity in
22   the discipline handed out to Plaintiff as opposed to
23   the treatment of white native born physicians, the
24   proceedings were not fair as the term is more generally
25   understood.

26   (176)   There have been malpractice cases brought against
27   OB/GYNs on staff at SMVH other than Plaintiff,
28   including three members of the Quality Improvement

COMPLAINT                          26

1           Committee.

2   (177)   In 1998 Case No. 42267 was lodged in the Superior Court

3           for the State of California, County of Monterey, by

4           patient D.B., alleging malpractice by Dr. James

5           Gilbert.

6   (178)   In 1998, Case No. 115893 was lodged in the Superior

7           Court for the State of California, County of Monterey,

8           by patients L.M. and J.M. alleging malpractice by SVMH,

9           Dr. Shelley Goodwein, Dr. Sanders Watkins and the

10          Sanders Watkins medical group.

11  (179)   In 2001, Dr. James Gilbert, Dr. Edward Ramirez,

12          Fertility Gynecology Center and Health Care for Women

13          settled a malpractice suit, Case No. 43369, Superior

14          Court for the State of California, County of Monterey,

15          for approximately three-quarters of a million dollars

16          in payments to the plaintiffs.

17  (180)   To the best of Plaintiff's information and belief, no

18          disciplinary action has been taken against these

19          physicians as a result of their actions as alleged in

20          these malpractice cases, even in the case in which a

21          substantial settlement adverse to the defendants was

22          made.

23  (181)   Plaintiff is aware of other serious instances of

24          physician misconduct which resulted in no discipline at

25          all.

26  (182)   Plaintiff is the only physician who has had a

27          recommendation that his privileges be  terminated by

28          the peer review process at Defendant during the past

COMPLAINT                        27

1             ten years as the result of hospital initiated actions

2             and not as the result of some other precipitating

3             external event such as loss or suspension of a medical

4             licensee.

5 (183)    By letter of August 23, 2001, Plaintiff was threatened

6             by Defendant with new disciplinary action in the form

7             of summary suspension of all privileges, asserting

8             deliberate non-compliance with the Defendant's July 13,

9             2001 order.

10 (184)    The conditions on the 90 day suspension were that

11             Plaintiff take a course(s) on interpersonal relations,

12             and that he develop a plan to care for his patients

13             during his suspension and otherwise comply with the

14             medical staff bylaws.

15 (185)    Plaintiff and Defendant's representative, Dr. Perrott,

16             had in fact developed a plan to care for his patients.

17 (186)    The plan contained three options for patients: Care at

18             Defendant by other physicians in the community, care at

19             Defendant by the doctor on-call, and care by Plaintiff

20             at Natividad. In fact, other physicians delivered the

21             majority of Plaintiff's patients during the suspension

22             term.

23 (187)    Plaintiff contracted with Dr. Preston to cover all of

24             his deliveries as of September 21, 2001.

25 (188)    On the effective date of the suspension, Plaintiff had

26             approximately 82 patients awaiting delivery projected

27             to occur during the term of the suspension.

28 (189)    Sixty-four of Plaintiff's patients were transferred to

1                 the care of Drs. Halfpenny and Preston and delivered

2                 during the 90 day term of the suspension at Defendant

3                 pursuant to the  arrangement Plaintiff made with

4                 Defendant through Dr. Perrott.

5 (190)     Twelve of Plaintiff's patients presented themselves as

6                 unregistered patients to Defendant, their hospital of

7                 choice, for delivery by the physician on-call.

8 (191)     Approximately six of Plaintiff's patients chose to be

9                 delivered elsewhere by other physicians.

10 (192)    At least seventy patients were informed of Plaintiff's

11                suspension and that alternative coverage could be

12                secured.

13 (193)    Seven additional patients presented for delivery by the

14                on-call physician at Defendant, but these presented

15                after the original expiration date of the suspension.

16 (194)    Plaintiff chose to resign his privileges at Natividad

17                rather than to permit the Defendant to use his

18                suspension to divert his patients to Natividad when

19                they preferred treatment at Defendant.

20 (195)    On or about a date to be determined, before the ninety

21                day suspension was scheduled to expire and Plaintiff

22                was scheduled to return to the hospital, Defendant's

23                Medical Board convened a special meeting and voted

24                unanimously to summarily terminate Plaintiff's

25                privileges.

26 (196)    By letter of October 12, 2001, Plaintiff was notified

27                that he was summarily suspended permanently for failure

28                to adhere to the conditions of the suspension in the

COMPLAINT              29

1         July 13, 2001 directive.

2  (197)  On December 9, 2001, pursuant to Plaintiff's request
3         for a hearing on this second phase of the official
4         disciplinary action, the MEC granted a hearing
5         concerning Plaintiff's alleged failure to comply with
6         the directive's requirements during the original 90 day
7         suspension.

8  (198)  The hearing was convened on January 9, 2002, and
9         continued on January 21, January 25, February 8,
10         February 9, February 15, February 16, March 13, March
11         14, March 17, March 18, March 20 and March 21.

12  (199)  The hearing panel determined that the charge that
13         Plaintiff had not taken the required course(s) in
14         inter-personal relations was not proven.

15  (200)  The hearing panel determined that the charge that
16         Plaintiff failed to maintain malpractice insurance was
17         not proven.

18  (201)  The hearing panel determined that Plaintiff had,
19         substantially in accordance with the suspension
20         requirements, submitted a plan for patient care.

21  (202)  The hearing panel determined that Plaintiff's
22         resignation from Natividad resulted in Plaintiff's
23         patients presenting themselves for delivery by on-call
24         physicians at Defendant.

25  (203)  The hearing panel deemed Plaintiff's attempt to prevent
26         Defendant from off-loading indigent latina patients to
27         Natividad to be a violation of the plan submitted by
28         Plaintiff, even though the plan itself only mentions

1           Natividad as one of four possibilities for the care of
2           Plaintiff's patients.

3  (204)    The Hearing Panel decision was based on Plaintiff's
4           "not caring for his patients at Natividad."

5  (205)    Defendant affirmatively desired that Plaintiff continue
6           his practice at Natividad.

7  (206)    Defendant did not hold any concerns about Plaintiff's
8           competence which were serious enough to cause it to
9           prevent it from seeking to keep Plaintiff practicing at
10          Natividad and taking his latina Medi-Cal patients
11          there.

12 (207)    Defendant expressed no concerns about any potential
13          patient endangerment by Plaintiff at Natividad.

14 (208)    Plaintiff had notified his patients that he could not
15          deliver them at Defendant as each patient came into his
16          office for examination.

17 (209)    The hearing panel was dissatisfied with Plaintiff's
18          efforts to inform his patients of alternatives for
19          their care during his suspension, although the plan did
20          not specify any procedure or timing as to notice to
21          each patient.

22 (210)    On April 15, 2002, the MEC recommended revocation of
23          Plaintiff's privileges and staff membership.

24 (211)    The reasons for the revocation were that the Plaintiff
25          was uncooperative in "the orderly and proper
26          administration of the Hospital" and that his conduct
27          was "arrogant, defiant and a threat to patient safety,"
28          without any delineation of the specifics of how he was

COMPLAINT                           31

1          a threat to patient safety and without addressing how

2          being a "threat" at Defendant was inconsistent with the

3          panel's outrage at Plaintiff for not continuing to

4          treat patients at Natividad.

5    (212)   Although the hospital had expressed dissatisfaction

6          with Plaintiff's actions during the suspension, the

7          dissatisfaction stemmed from an alleged failure to have

8          a patient care plan, disapproval of Plaintiff's

9          selected course(s) in interpersonal relationships, and

10         with the problems in arranging coverage by *locum*

11         *tenens*.

12   (213)   The hearing did not focus on the failure to have a

13         patient care plan, but rather constituted an attack on

14         how Plaintiff carried out the plan because he did not

15         use Natividad for his poor latina patients, even though

16         Plaintiff had clearly put Defendant on notice of his

17         patients' desire to deliver at Defendant and the

18         "agreed upon plan" allowed these patients to present

19         themselves to Defendant as unregistered OB patients.

20   (214)   None of the stated reasons for revocation was the

21         subject of a formal "due process" notice to Plaintiff.

22         These "reasons" of uncooperativeness and "threat"

23         first appeared in the hearing panel report of April 15,

24         2002.

25   (215)   Plaintiff requested a hearing before an Appeal Panel,

26         and again Defendant breeched its bylaws and bypassed

27         this step in the appellate process and scheduled a

28         hearing before the Board of Directors.

COMPLAINT                           32

(216)     To date, Defendant has failed, refused, and omitted to reinstate Plaintiff's privileges.

(217)     Defendant has discriminated against Plaintiff on the basis of his race and national origin, contrary to its By-Laws and with gross disregard for Plaintiff's rights.

(218)     Defendant has discriminated against Plaintiff on the basis of his contractual relationships with a large number of latina patients.

(219)     Defendant did not act in good faith or without malice in its peer reviews of Plaintiff's performance, in that Plaintiff was not afforded a fair and timely opportunity to make a defense, in that the results of earlier proceedings in which Plaintiff had been found to have met the standard of care were overturned without cause or fault found with the earlier determinations, and in that the review conducted of Plaintiff's work was biased and based upon incomplete information.

(220)     Plaintiff has been treated differently than other physicians who are white and who were subject to a peer review by Defendant, and who were not subjected to any discipline at all.

(221)     Defendant has held Plaintiff to a higher standard of care, both in credentialing for surgical privileges and patient care review, than other non-Arab physicians at Defendant.

(222)     Defendant has reviewed Plaintiff's patient charts more

COMPLAINT                                    33

harshly than those of white native born physicians.

(223)   The "severity codes" in regard to Plaintiff's cases were arbitrary and capricious, and not similarly applied to other physicians in a medical peer review.

(224)   Defendant has purposely and maliciously drawn out the hospital administrative process over almost six months since October 2001, so as to avoid reinstating Plaintiff's privileges.

(225)   Defendant has raised the standards to obtaining specific clinical procedures to exclude Plaintiff as he gained sufficient proficiency to qualify under preceding standards for privileging, particularly in the area of laproscopically assisted surgery.

(226)   Following the suspension by Defendant in 2001, the number of patients treated daily by Plaintiff decreased substantially.

(227)   It is Plaintiff's belief that since his suspension from Defendant, in July 2001, Defendant's patient load of latina Medi-Cal patients has continued and will continue to decrease at a significant rate.

(228)   Since his suspension, the nature of Plaintiff's medical practice has changed significantly in that Plaintiff can no longer deliver babies nor performs gynecologic surgery although he has and does intend in the future to pursue these activities.

(229)   Plaintiff has continued to provide prenatal care to his reduced patient load which still consists mostly of impoverished latinas.

COMPLAINT                          34

**CLAIM I**

**VIOLATION OF 42 U.S.C. § 1981:**
**VIOLATION OF PLAINTIFF'S RIGHTS TO BE FREE OF**
**DISCRIMINATION ON THE BASIS OF RACE AND NATIONAL ORIGIN**

(230)    Defendant's has intentionally discriminated against
         Plaintiff based upon his race and/or national origin,
         as shown by both Defendant's statements and its actions
         as recited above.

(231)    Defendant has treated Plaintiff adversely in a manner
         in which white physicians are not treated.

(232)    By holding Plaintiff to a higher standard of care in
         peer review than that to which non-Arab physicians are
         held, Defendant discriminated against Plaintiff on the
         basis of Plaintiff's race and national origin.

(233)    By limiting Plaintiff's ability to defend himself in
         peer review and by failing to accord Plaintiff
         procedures and safeguards extended to non-Arab native
         born physicians, Defendant discriminated against
         Plaintiff on the basis of Plaintiff's race and national
         origin.

(234)    By permitting only a biased "outside" review without
         Plaintiff's input, in the course of disciplinary
         proceedings, while according unbiased, outside reviews
         to non-Arabs, Defendant discriminated against Plaintiff
         on the basis of Plaintiff's race and national origin.

(235)    Defendant has suspended and then threatened to
         terminate Plaintiff's staff membership and privileges
         to practice at Defendant, depriving him of his rights

COMPLAINT                          35

as embodied in the bylaws and to enjoy the benefits, privileges terms and conditions thereof, on the basis of Plaintiff's race and/or national origin, in violation of 42 U.S.C. §1981.

## CLAIM II

### VIOLATION OF 42 U.S.C. § 1981:
### VIOLATION OF PLAINTIFF'S RIGHTS TO BE FREE
### OF DISCRIMINATION ON THE BASIS OF HIS RELATIONSHIP WITH
### HIS PATIENTS OF NON-WHITE OR NON-NATIVE ORIGIN

(236)   Defendant had also discriminated against Plaintiff on the basis of his contractual association with patients who are latina, depriving him of his right to perform his contracts with them and enjoy the benefits of those contracts.

(237)   Defendant has retaliated against Plaintiff and discriminated against him as a consequence of his attempts to assure that the latina patients who were his patients could continue to be treated at Defendant, as opposed to being diverted to the less desirable county hospital.

(238)   Defendant's retaliation and discrimination is under the pretext of professional discipline, but is in fact imposed on him as a result his resignation of his privileges at the county hospital so as to preclude him having to try take all or most of his latina patients there following his suspension, and his general refusal to cooperate in Defendant's plan or practice of offloading indigent latina patients.

COMPLAINT                        36

1  (239)   As a direct and proximate result of the foregoing,
2          Plaintiff has suffered, and continues to suffer,
3          irreparable injuries relating to embarrassment,
4          degradation, humiliation, emotional stresses, physical
5          pain and mental anguish, injury to professional
6          standing, injury to character and reputation, and
7          losses of income, property, wealth, and has sustained
8          damages and continues to sustain damages.  Plaintiff's
9          character and reputation as a physician in the
10         community has been completely and irreparably destroyed
11         due to the summary suspension and termination of
12         Plaintiff's privileges, and due to adverse publicity
13         that continues to this date.
14 (240)   Plaintiff has suffered and continues to suffer economic
15         damage to his medical practice via loss of the income
16         from patients he was unable to hospitalize at Defendant
17         as a consequence of his suspension, and loss of future
18         expected income from treatment of patients due to the
19         changes in his practice as a consequence of Defendant's
20         discriminatory actions.
21

22                        **CLAIM III**

23              **VIOLATION OF 42 U.S.C. § 2000d**
24  **DISCRIMINATION CONCERNING PARTICIPATION IN FEDERAL PROGRAMS**

25 (241)   Defendant participates in the Medicare and Medi-Cal
26         programs and as such is a recipient of federal funding.
27 (242)   Defendant has, via its peer review actions as recited
28         above, engaged in discrimination toward Plaintiff

COMPLAINT                    37

designed to have a disparate, untoward impact upon his indigent Latina patients by depriving them of access to his services, and by extension of access to Defendant for purposes of receiving the benefits of federal funding under health care programs designed to benefit them, in violation of 42 U.S.C. 2000e.

(243)   Defendant has intentionally discriminated against Plaintiff, who is himself a member of an ethnic minority and of Jordanian national origin, on the basis of his existing contractual relationships with indigent latina patients and on the basis of his intention to continue to treat indigent latina patients at Defendant without regard to their race or ethnicity.

(244)   Defendant, furthermore, discriminated against Plaintiff when he refused to engage in a conspiracy to discriminate against indigent latina patients by transferring the care of his indigent latina patients to the county hospital and in fact, resigned his privileges at that other hospital to thwart Defendant's plan to shift its indigent latina patient load to that hospital.

(245)   The actions taken against Plaintiff since July 2001, have been in part because of the fact that Plaintiff took action to assure that his indigent latina OB patients could be delivered at Defendant, and in part because several of his indigent latina OB patients actually presented themselves at Defendant for delivery by the physician on call or under arrangements made

COMPLAINT                              38

with another physician at Defendant for coverage during the term of Plaintiff's suspension.

(246)   The Defendant's actions against Plaintiff are a part of a continuing effort by Defendant to reduce its load of indigent latina patients.

(247)   The pregnant indigent latina patients who had been Plaintiff's patients for delivery during the 90 day suspension have now all been delivered of their children by other physicians.

(248)   Plaintiff has suffered economic injury as a direct consequence of Defendant's discrimination against him as an Arab, and as a consequence of Defendant's attempts to reduce the share of its patient population made up of indigent latina patients.

(249)   Plaintiff continues to suffer injury via his inability to deliver patients at Defendant without regard to the patient's race or ethnicity.

**CLAIM IV**

**CONSPIRACY TO VIOLATE 42 U.S.C. § 1985**

(250)   Defendant agreed, starting in or about 1995,  with, *inter alia,* CEO Downing*,* Dr. Goodwein, Dr. Nelson, and other members of the Department of OB/GYN at Defendant, to a course of discrimination against Plaintiff as a non-native Arab, which agreement continues to date.

(251)   Defendant did agreed with *inter alia,* CEO Downing*,* Dr. Goodwein, Dr. Nelson, and other members of the Department of OB/GYN at Defendant, starting in or about

1995, on a discriminatory course of action against Plaintiff as a part of an overall design to reduce Defendant's load of indigent latina patients, which agreement continues to date.

(252)    With the exception of Mr. Downing, the co-conspirators named above are not employees of Defendant, but are independent actors in the conspiracy.

(253)    As a part of the conspiracy, Defendant and its co-conspirators took the following actions against Plaintiff:

    (a)    summarily suspending Plaintiff's privileges contrary to the requirements of the bylaws for summary suspension, there being no imminent patient endangerment shown;

    (b)    disciplining Plaintiff's for reasons other than medical incompetence or unethical behavior

    (c)    refusing to reinstate Plaintiff's medical privileges for reasons other than medical incompetence, unethical behavior, or neutral business considerations;

    (d)    subjecting Plaintiff to harassment by Defendant Downing on the basis of his race and national origin;

    (e)    subjecting Plaintiff to harassment on the basis of his contractual relationships with indigent latina patients, and

    (f)    subjecting Plaintiff to disciplinary action for resignation of his privileges at another hospital in an attempt to thwart Defendant's acts in furtherance of its conspiracy to reduce its load of indigent latina patients.

COMPLAINT                    40

(254)     Plaintiff has been damaged by this conspiracy via his
          inability to access Defendant for purposes of treating
          patients without regard to the race or ethnicity of
          those patients.

(255)     Plaintiff has been damaged by this conspiracy via his
          inability, due to discrimination against him as a non-
          native Arab, to access Defendant for purposes of
          continuing his medical practice.


                              **CLAIM V**

               **INTENTIONAL INTERFERENCE WITH CONTRACT
                AND WITH BUSINESS EXPECTANCIES**

(256)     Defendant was at all relevant times aware that
          Plaintiff was in contractual relationships with his
          patients.

(257)     Without justification and/or maliciously, Defendant
          prevented Plaintiff from performing his agreements with
          his patients as to delivery of their children at
          Defendant via abuse of Defendant's disciplinary process
          against Plaintiff.

(258)     Without justification and/or maliciously, Defendant has
          prevented and is preventing Defendant from realizing
          the contractual relationships he could have reasonably
          expected to enter with pregnant patients and patients
          needing gynecological surgeries who desire that their
          deliveries or surgeries be performed by Plaintiff at
          Defendant.

(259)     As a result, Plaintiff suffered damage via the loss of

COMPLAINT                           41

1      income from then current patients, and future loss of

2      income from patients with whom he would have expected

3      to have contractual relationships but for Defendant's

4      interference.

5                                **CLAIM VI**

6      **VIOLATION OF California Business and Professions CODE § 510**

7  (260)   Defendant has a policy and/or practice of reducing its

8          load of indigent latina patients.

9  (261)   Defendant has retaliated against Plaintiff for his

10         advocacy of treatment of patients without respect to

11         race or national origin and his actions taken in

12         support thereof.

13 (262)   Defendant has retaliated against Plaintiff for his

14         protect of the discriminatory policies of the hospital

15         which impair his ability to provide appropriate health

16         care to his patients.

17 (263)   Defendant has used the pretext of peer

18         review/disciplinary action to accomplish the

19         retaliation; however, the peer review was not

20         reasonable.

21 (264)   The ostensible peer review engaged in by Defendant was

22         not in compliance with California Business and

23         Professions Code §809.5 in that it was not taken

24         exclusively in the interest of maintaining and

25         enhancing quality patient care.

26 (265)   The ostensible peer review engaged in by Defendant was

27         not in compliance with California Business and

28         Professions Code §809.5 in that the prerequisite of

COMPLAINT                              42

immediate danger to an individual's health was not present.

(266)  The ostensible peer review engaged in by Defendant was not in compliance with California Business and Professions Code § 809.5 in that the procedures afforded Plaintiff following the suspension were not in accord with §§ 809.1 - 809.4 inclusive in that they failed to accord Plaintiff with fundamental fairness in opportunity to present a defense.

## CLAIM VII

### VIOLATION OF CALIFORNIA CIVIL CODE § 50 *et seq.*

(267)  Defendant is an establishment which conducts the business of providing hospital facilities and services.

(268)  Defendant has discriminated against Plaintiff on the basis of his national origin in violation of California Civil Code § 51.5 in that it imposed discipline upon him of a severity not imposed upon white physicians for acts of equal or greater seriousness to those allegedly committed by Plaintiff.

(269)  Defendant has discriminated against Plaintiff on the basis of the race and national origin of his customers in violation of California Civil Code § 51.5 via its actions to deprive him of membership on the medical staff as a measure to reduce Defendant's load of indigent Latina patients.  Plaintiff's "uncooperativeness" took the form of an attempt to thwart Defendant's plan to divert indigent latina

1            patients to the less desirable county hospital in order

2            to reduce its own treatment of such persons.

3

4                              **DAMAGES**

5   (270)    As a direct and proximate result of the Defendant's

6            violations of 42 U.S.C. §§ 1981, 1985 and 2000d,

7            Defendant has deprived and continues to deprive

8            Plaintiff of the benefits of the contractual

9            relationship between them, and of achieving a

10           livelihood as a Doctor of Medicine in the community and

11           elsewhere.

12  (271)    As a direct and proximate result of the actions of the

13           Defendant in violation of 42 U.S.C. 1981, 1985 and

14           2000d, Plaintiff has suffered damages as stated herein

15           and to be proven at trial, and in an amount exceeding

16           12 million dollars, plus an appropriate amount for his

17           emotional pain and suffering, and punitive.

18  (272)    Plaintiff's character and reputation as a physician in

19           the community has been and is being irreparably

20           destroyed, as a result of the summary suspension of

21           Plaintiff's privileges, which was in violation of

22           Defendant's By-Laws, and as a result of the adverse

23           publicity that continues to this date, due to the lack

24           of reinstatement of Plaintiff's privileges at Defendant

25           during the new medical peer review process.

26  (273)    As a direct and proximate result of Defendant's actions

27           in intentionally or negligently inflicting emotional

28           distress upon Plaintiff, Plaintiff has suffered, and

COMPLAINT                        44

|   |   |   |
|---|---|---|
| 1 |       | continues to suffer, irreparable injuries relating to |
| 2 |       | embarrassment, degradation, humiliation, emotional |
| 3 |       | stresses, physical pain and mental anguish, injury to |
| 4 |       | professional standing, injury to character and |
| 5 |       | reputation, and losses of income, property, wealth, and |
| 6 |       | has sustained damages and continues to sustain damages. |
| 7 | (274) | As a direct and proximate result of the actions of the |
| 8 |       | Defendant in interfering with Plaintiff's existing |
| 9 |       | contractual relationships with patients, Plaintiff has |
| 10 |      | been deprived of an amount to be determined. |
| 11 | (275) | As a direct and proximate result or the actions of the |
| 12 |      | Defendant in interfering with Plaintiff's reasonable |
| 13 |      | expectancies of future contracts with OB/GYN patients, |
| 14 |      | Plaintiff has been deprived on an amount to be |
| 15 |      | determined. |
| 16 | (276) | Plaintiff has been actually damages in an amount to be |
| 17 |      | determined, via loss of revenues from patients via |
| 18 |      | Defendant's retaliatory actions in violation of |
| 19 |      | California Business and Professions Code §510. |
| 20 | (277) | Plaintiff has been actually damaged in an amount to be |
| 21 |      | determined, via loss of revenues from patients and |
| 22 |      | prospective patients, and via deprivation of his right |
| 23 |      | to associate with persons of a racial minority, caused |
| 24 |      | by Defendant's violation of California Civil Code § |
| 25 |      | 51.5, with the damages being in an amount to be |
| 26 |      | determined, and asserts damage to the extent permitted |
| 27 |      | under Sec. 52 of the California Civil Code, including |
| 28 |      | attorneys fees. |

COMPLAINT                              45

1

2                                   **RELIEF**

3          WHEREFORE, Plaintiff hereby demands a trial by jury and

4    prays for the following legal, equitable, declaratory, and

5    injunctive remedies:

6          a.    That Defendant be ordered to re-instate Plaintiff's

7                privileges, so that Plaintiff may exercise or resign

8                his staff membership as he so desires;

9          b.    That Defendant be ordered to correct any and all

10               adverse actions reported to the National Practitioners

11               Data Bank, of and pertaining to the Plaintiff, and to

12               notify the National Practitioners Data Bank of the

13               reinstatement of Plaintiff's privileges;

14         c.    That the Court grant Plaintiff an award that requires

15               Defendant to compensate Plaintiff monetarily for the

16               full value of income, property, wealth, and loss of

17               future earnings that Plaintiff would have received had

18               it not been for Defendant's discriminating against

19               Plaintiff, with interest thereon;

20         d.    That the Court grant Plaintiff an award that requires

21               Defendant to compensate Plaintiff monetarily for

22               injuries suffered by Plaintiff to his professional

23               standing, character, and reputation;

24         e.    That the Court grant Plaintiff an award that requires

25               Defendant to compensate Plaintiff monetarily for

26               injuries suffered by Plaintiff, including medical

27               expenses, for depression, shame, humiliation, severe

28               emotional distress, physical pain and mental anguish,

COMPLAINT                              46

1     and feelings of self-worthlessness and loss of

2     humanity;

3  g.  That Plaintiff be awarded against Defendant punitive

4     damages;

5  h.  That Plaintiff be awarded against Defendant all costs

6     and expenses of this litigation, and reasonable

7     attorneys' fees;

8  i.  That Plaintiff be granted immediate injunctive relief

9     to prevent the further depravation of his rights and

10    those of his indigent latina patients.

11  j.  That Plaintiff be granted such further legal,

12    equitable, declaratory, and injunctive relief as this

13    Court may deem just and proper.

COMPLAINT       47

1

2                                    RESPECTFULLY SUBMITTED,

3

4
    Date: _____       _____
5                            J. CLAYTON CULOTTA

6

7
    Date: _____       _____
8                            KENNETH JOEL HABER
                             Law Office of Kenneth Joel Haber, P.C.
9                            15879 Crabbs Branch Way
                             Rockville, MD 20855
10                           Telephone No.: (301) 670-0016
                             Facsimile No.:  (301) 948-3091
11                           Counsel for Plaintiff: Nizar A. Yaqub

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    COMPLAINT                        48

1

2

3

Date: _____

4                                    _____
                                     EUGENE EPSTEIN (State Bar No:031267)
5                                    144 West Gabilan
                                     Salinas, California 93901
6                                    Telephone No.: (831) 754-4400
                                     Facsimile No.: (831) 754- 1201
7                                    Counsel for Plaintiff: Nizar A. Yaqub

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                            49